FILED
U.S. District Court
District of Kansas

NOV 02 2026

Clerk, U.S. District Court
By [signature] Deputy Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| JOSEPH L. SUBLETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 6:26-cv-1399-HLT-GEB |
| | ) | |
| JAMES T. "TIM" BRYAN, in his individual and official capacities; and CITY OF BENTLEY, KANSAS, | ) | |
| | ) | |
| Defendants. | ) | |

# COMPLAINT FOR VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)

## JURY TRIAL DEMANDED

## DESIGNATION OF PLACE OF TRIAL: WICHITA, KANSAS

## INTRODUCTION, JURISDICTION AND VENUE

1. Beginning at approximately 10 p.m. on November 1, 2024, and continuing into the early hours of November 2, 2024, the Chief of Police and City Administrator of Bentley, Kansas, off duty and in his own unmarked SUV, chased Joseph Sublett's family for miles through Wichita as they drove home from their son's football game. He then arrested Joseph in his own front yard, kicked his leg out from under him, and searched his home and vehicle without a warrant. Joseph had repeated seizures while handcuffed. His blood alcohol was "Not Detected," and he was never prosecuted, but Bryan's false paperwork cost him his driver's license.

2. Joseph brings this action under 42 U.S.C. § 1983 for violations of his rights under the Fourth and Fourteenth Amendments to the United States Constitution.

3. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3).

4. Venue is proper in the District of Kansas under 28 U.S.C. § 1391(b), because the events occurred in Sedgwick County, Kansas, and Defendants reside in Kansas.

5. Under D. Kan. Rule 40.2, Joseph designates Wichita, Kansas as the place of trial.

## PARTIES

6. Plaintiff Joseph L. Sublett is an adult resident of Wichita, Sedgwick County, Kansas, living at 7434 W. Warren Street.

7. Defendant James T. "Tim" Bryan was, at all relevant times, both the Chief of Police and the City Administrator of the City of Bentley, Kansas. He is sued in his individual and official capacities.

8. Bryan acted under color of state law throughout. He was in uniform. He used police radio and dispatch to report Joseph, call for help, and track Joseph home with a Kansas Highway Patrol helicopter. He identified himself as a police officer, arrested and handcuffed Joseph, searched Joseph's home and vehicle, seized property, served a Kansas implied-consent refusal form, and wrote Bentley Police Department report no. 24-0089 under badge number BE-01.

9. Defendant City of Bentley, Kansas (the "City") is a municipality in Sedgwick County, Kansas, and is a "person" subject to suit under § 1983. As Chief of Police and City Administrator, Bryan was the City's final policymaker for law enforcement and answered to no one else in city government on police matters.

## FACTS

### The drive home

10. On the night of November 1, 2024, Joseph was driving his family home to 7434 W. Warren Street in Wichita in their black 2015 Jeep Grand Cherokee, coming from his son's final high school football game. Joseph's wife, Stacey, Joseph's mother, Michelle Briley, and Joseph's seven-year-old daughter, A.S., were in the Jeep. Stacey and Michelle Briley witnessed everything that followed.

11. Bryan was off duty, driving his personally owned white SUV, which had no police markings, home from a part-time security job at INTRUST Bank Arena.

12. Bryan followed the Jeep at high speed for about ten minutes and seven miles through Wichita, at night. Joseph and his family had no idea the driver was a police officer and believed they were being chased by a road-raging stranger.

13. While following, Bryan radioed dispatch and reported himself as an officer in distress. That brought a Kansas Highway Patrol helicopter and officers from the Kansas Highway Patrol, the Wichita Police Department, and the Maize Police Department. The helicopter tracked the Jeep, and Bryan got the family's home address from dispatch.

14. Bryan never pulled the Jeep over. By his own report, he stopped following at 13th Street North. Joseph lost the SUV and drove home.

15. Every event in this complaint took place inside the City of Wichita, outside the city limits of Bentley.

**The arrest at the Sublett home**

16. Moments after Joseph got home, the same white SUV pulled up to his house. Bryan had no warrant.

17. Still not knowing who had chased his family, Joseph went into the house briefly and then came back outside.

18. Bryan never approached Joseph or the front door. He walked directly to the Jeep, parked between the two homes, where Stacey and Joseph's mother were getting out. Joseph met him at the back of the Jeep. Bryan asked whether Joseph was the driver. Joseph asked why Bryan had been following him and why he was there. Bryan answered, "We'll get to that," and asked again whether Joseph was the driver. Joseph said yes. Bryan then began trying to search or arrest Joseph, who, still confused, kept asking what was going on.

19. Approximately 45 seconds after Bryan arrived, responding to Bryan's "officer in distress" call, Master Trooper Brian Patrick of the Kansas Highway Patrol pulled up and ran

into the yard with his taser already drawn. He and Bryan both faced Joseph and tried to restrain him. When Stacey and Joseph's mother became upset and shouted at them to stop, both officers turned around. Bryan shoved Joseph's mother, Michelle Briley, back. Joseph's hospital records note that a family member was restrained and threatened with mace.

20. Bryan's report indicates that he called for help only after arriving at the house. But a responding officer told the family, on video, that Bryan had already radioed that he was an officer in distress while following the Jeep, before he ever reached the house. Patrick's arrival within about 45 seconds of Bryan's is consistent with that earlier call, not with a call made at the scene.

21. With the women a few feet away, Bryan and Patrick turned back to Joseph. Joseph, unarmed, again asked why he was being arrested. Bryan answered by kicking Joseph's legs out from under him and knocking him to the ground, injuring his leg and knee. Both officers then handcuffed him. While they were restraining and arresting Joseph, his mother took his hysterically crying seven-year-old daughter, A.S., into the house so she would not have to watch. On the video, A.S. can be seen and heard screaming "Please stop" throughout the incident.

22. Bryan, on Joseph's right, and Master Trooper Patrick, on his left, then walked Joseph to a Wichita Police Department patrol vehicle and placed him in the back seat. Video shows Joseph speaking clearly as he was led to the car.

**The seizures**

23. While handcuffed in the back of the patrol car, Joseph had a seizure.

24. Wichita Police Officer Reed Bartenhouse pulled him out of the car and laid him on the ground, still handcuffed. Joseph had another seizure. That officer let the family talk to Joseph to calm him so he would not seize again.

25. According to Joseph's medical records, Joseph had at least four seizures that night: one when the first seizure began, two more witnessed by the fire department before

EMS arrived, and at least one more witnessed by RN Danyel Teague when she took over his care at the hospital. Hospital staff treated him with Ativan and Keppra, which are anti-seizure medications, along with acetaminophen and an IV fluid bolus.

26. When EMS arrived, Bryan removed Joseph's handcuffs once he was on the gurney and told the family he was "unarrested." Emergency medical services then took Joseph to Ascension Via Christi St. Francis Hospital, where he arrived at 10:59 p.m. Hospital staff witnessed more seizure activity and documented his left ankle and knee injuries.

27. Hospital blood testing at 11:14 p.m. found Joseph's blood alcohol level "Not Detected." A CT scan of his head was normal.

**The warrantless searches**

28. While Joseph was seizing on the ground, Bryan left and went into the Sublett home alone. Master Trooper Brian Patrick of the Kansas Highway Patrol stood outside the front door and kept the family from going in.

29. Joseph's seven-year-old daughter was inside the house, alone with Bryan.

30. Bryan had no warrant and no consent. Joseph's wife Stacey, who lived in the home at the time, never agreed to let him in. Bryan's own report admits he first told her the home was "being secured for investigation," that it was "inaccessible" to her, and that he would seek a search warrant. Joseph's mother, Michelle Briley, who was in the Jeep during the chase and present at the house, can be heard on video saying, "We don't want no cops in the house."

31. Inside, unsupervised, Bryan took Joseph's property, including Joseph's driver's license from his wallet. He came out and walked directly to his own SUV, more than once. No one knows what else he took.

32. Bryan also searched Joseph's Jeep several times without a warrant. His report admits he found "no items of contraband."

33. Bryan never obtained a search warrant. Bryan's report claims he found a small amount of marijuana, and states that after leaving the hospital he went to the Bentley Police Department to "log the evidence into secure holding." The item was not submitted to a lab until January 15, 2025, and a lab report dated February 27, 2025 identified it as marijuana weighing 6.83 grams. Joseph denies having any marijuana. Despite Bryan's statement that he logged the evidence, when Joseph's representative requested " [e]vidence logs with pictures of evidence collected while Chief Bryan searched Joseph Sublett's home, Jeep, and property," the City Clerk answered on April 28, 2026: "None as requested." Joseph was never charged with possessing marijuana.

**At the hospital**

34. Bryan followed the ambulance to the hospital.

35. At the hospital, Bryan entered Joseph's room and demanded a blood test. Bryan had no warrant, and Joseph did not consent. According to the medical record of RN Danyel Teague, who took over Joseph's care at 11:00 p.m. and herself witnessed seizure activity, Bryan arrived "to request a blood draw for alcohol" and told her "it was my call as to whether or not I wanted to do a blood draw for the officer." She responded "that we already did our own labs and that his seizures were witnessed by EMS as well as myself." Bryan thus tried to have hospital staff draw Joseph's blood for him without a warrant or Joseph's consent. Joseph was confused, stuttering, and heavily medicated from his seizures and the drugs given to stop them.

36. Bryan dropped a Kansas implied-consent refusal form (DC-27) on Joseph's lap, told him to talk to his attorney, and left. The form claimed slurred speech, difficulty communicating, and poor balance.

**Bryan's report is contradicted by the evidence**

37. Bryan's report 24-0089 is false in key respects. Wichita Police Officer Reed Bartenhouse's report and the family's videos contradict it:

a. Bryan wrote that Joseph "sat in the grass" or by the curb when the seizure began. Officer Bartenhouse wrote that Bryan asked to put Joseph in a Wichita patrol car, that Joseph was placed inside, and that he pulled Joseph out and laid him on the ground. Video shows this (Sublett Video 1, 2:06). Joseph never sat in the grass or on a curb.

b. Bryan wrote that the family "encroached upon the scene" and screamed. Officer Bartenhouse wrote that after the second seizure he allowed the family to talk to Joseph to calm him. Video shows a calm scene (Sublett Video 1, 2:50; Sublett Video 3, 2:15).

c. Bryan wrote that a trooper went into the house with him. The trooper, Master Trooper Brian Patrick, has said he stayed outside, and video shows that (Sublett Video 1, 3:45).

d. Bryan wrote that Joseph "claimed no injuries." Joseph told Bryan, Master Trooper Patrick, and Wichita Police Officer Reed Bartenhouse at the scene that his legs and arms were hurt, and told RN Danyel Teague "it hurts" (Sublett Video 3).

e. Bryan wrote that at the hospital he read the implied-consent advisory aloud, asked several times for a blood test, and dropped the form only because the family shouted over him. RN Teague's contemporaneous note records something different: that Bryan left the decision about a blood draw to her. Yet on the DC-27, Bryan checked the box certifying that Joseph "refused to submit to or complete testing," although Joseph, confused and heavily medicated after repeated seizures, was never in a condition to knowingly refuse, and the hospital had already tested his blood and found no alcohol.

38. Master Trooper Patrick, who responded to Bryan's call, told the family he had "showed up after the fact." He said that if someone had followed him like that, he would have

pulled over with his own gun. He asked the other responding agencies whether they were wearing body cameras.

**Afterward**

39. Bryan's report, Bentley case no. 24-0089, lists suspected offenses of reckless driving, DUI, drugs, and child endangerment. Joseph was never given a ticket or a court date for any of them, or for any other offense from that night. In February 2026, more than fifteen months later, Bryan presented the case to the Sedgwick County District Attorney. The District Attorney's office declined to prosecute, as District Attorney Marc Bennett confirmed by email on March 17, 2026. Joseph has not been convicted of anything arising from November 1, 2024.

40. Even so, the refusal form Bryan filed caused Joseph's driver's license to be suspended on December 1, 2024. The suspension ended December 1, 2025, but the Kansas Department of Revenue still requires an ignition interlock device for two years. Joseph challenged the agency's action in Sedgwick County District Court, Sublett v. Kansas Department of Revenue, No. SG-2026-CV-001178 (filed March 31, 2026). That case was dismissed on September 8, 2026, after Joseph's attorneys withdrew.

41. On August 3, 2026, in a traffic case arising from Joseph driving while his license was suspended, State of Kansas v. Sublett, No. SG-2025-TR-006837 (Sedgwick County District Court), the court granted Joseph's motion. The judge wrote on the trial docket sheet that Joseph's driver's license "was wrongfully suspended" and that Joseph "was wrongfully required to obtain an Ignition Interlock Device," and directed the Division of Motor Vehicles to reinstate his license and remove the interlock requirement. Despite that order, the Kansas Department of Revenue has continued to require the interlock device.

42. For nearly two years, the only document Joseph ever received about that night was the DC-27 refusal form Bryan dropped on his hospital bed. Because Joseph never received a ticket, court date, or charging document, requests under the Kansas Open Records

Act (KORA) were the only way to learn anything about his own case. Each time, Bryan refused to provide information, calling it an open investigation.

43. On March 31, 2026, Ashley Blackmon, helping Joseph, submitted a KORA request for Bryan's report. She had to follow up on April 2 and April 3 before the City Clerk even confirmed receipt. Nearly every reply from the City copied the same four people: the City Clerk, Mayor Tracy Pribbenow, the city attorney, and Bryan himself, as City Administrator. There was no way to seek records about Bryan's conduct without Bryan knowing.

44. The City did not release Bryan's report until April 28, 2026, four weeks after the request and after the District Attorney's office had declined to prosecute. The City had held that report since November 2024.

45. Every later request for information about Joseph's arrest has met the same pattern of delay, silence, and repeated follow-ups, as described further in paragraph 50. The City produced no body-camera or dash-camera footage, stating that none exists.

46. Because of Defendants' conduct, Joseph suffered injuries to his leg and knee, repeated seizures, loss of liberty, the loss of two jobs, damage to his reputation at work and among his neighbors, who watched a Kansas Highway Patrol helicopter and officers from four law enforcement agencies, along with Wichita Fire and EMS, converge on his home, loss of his ability to drive to work, the cost of two years of an interlock device, medical expenses, fear, humiliation, and severe emotional distress.

**Bryan's history and the City's knowledge**

47. Bryan's conduct on November 1, 2024 fits a pattern going back more than two decades, across several police departments in two states. On information and belief:

a. In June 2000, while Chief of Police of Maize, Kansas, Bryan confronted licensed private detective Tom Basore, who was sitting in a parked car and had shown his state-issued detective license and concealed-carry certification.

According to Mr. Basore, Bryan disarmed him, escalated the encounter, and struck him in the back of the head with a flashlight, causing a concussion treated at St. Francis Hospital. Bryan then arrested him for obstructing official duty, against the advice of the city attorney. He drove Mr. Basore to jail unbelted, taking corners fast enough to throw him against the back seat. The next day, a Maize municipal judge ordered Bryan to return Mr. Basore's firearm and credentials. Mr. Basore sued Bryan and the City of Maize under 42 U.S.C. § 1983 in this Court: Basore v. City of Maize, et al., No. 6:01-cv-01171-JTM-KMH (D. Kan., filed June 6, 2001). The case was dismissed as settled on May 23, 2002. Bryan resigned from Maize shortly afterward and left Kansas for Alabama.

b. In 2003, while Bryan was Chief of Police in Valley, Alabama, officer Jerome Bailey sued Bryan and the City of Valley under § 1983 for racial discrimination. He alleged the city failed to properly hire, train, and supervise Bryan. Bailey v. City of Valley, No. 3:03-cv-588 (M.D. Ala.). The case settled in January 2004.

c. In 2005, a mother sued the City of Valley and Bryan's department, alleging it refused to investigate the rape of her 13-year-old daughter because the girl was Black. Thomas v. City of Valley, No. 3:05-cv-689 (M.D. Ala.). The federal claim was dismissed in November 2005 and the state claims were sent back to state court.

d. In October 2005, Bryan became Chief of Police of Foley, Alabama. On January 10, 2006, the Foley mayor placed him on paid administrative leave until February 1, 2006. According to contemporaneous reports in the Mobile Register and Baldwin Register, Bryan signed a letter of reprimand stating that he violated city personnel policy by investigating a complaint about an employee himself instead of reporting it to the city's equal employment

opportunity officer, and that he failed to give the mayor appropriate information during the investigation of a subordinate's complaint. Bryan resigned on March 24, 2006, after about five months in office. Days later, the mayor told the city council, "We have eight officers of the Foley Police Department, four of which have an attorney, who have filed formal complaints against the chief and have four that are in confidential discussion. We have investigations going on all eight of those matters." In 2008, Bryan sued the City of Foley and its former mayor for defamation in Baldwin County, Alabama, denying that he had violated the personnel policy.

e. In 2015, Bryan was Director of Public Safety and Chief of Police at Butler Community College in El Dorado, Kansas. In Mathews v. Butler Community College, No. 17-1175-EFM (D. Kan.), a case against the college in this Court, the Court's Memorandum and Order of September 17, 2019 set out the following facts, viewed in the light most favorable to the plaintiff. After a small fire in an art instructor's classroom, Bryan told the instructor that the lab was a crime scene and that he was the "number one suspect," and seized the instructor's glass pieces as evidence. A college vice president later told the instructor that if he did not retire, Bryan would move forward with prosecution, and that if he left his employment, Bryan had agreed to hold the charges "in abeyance." The college's human resources director knew that telling the instructor he would be prosecuted unless he retired violated college policy. Bryan also ordered the maintenance department not to work on equipment in the instructor's area, although he had no supervisory authority over that department. The instructor was never charged with any crime. The Court denied the college's motion for summary judgment.

48. In Bentley, residents have made similar allegations against Bryan, on information and belief:

a. In May 2018, Bryana Grilliot says Bryan stopped her for carrying her mother's trellis, slammed her onto a car trunk, and jailed her without ever telling her the charge.

b. In December 2021, Melissa Anderson accused Bryan of false arrest, an illegal search and seizure, and intimidation.

c. In 2023, Jonathan Pierce filed a complaint with the Kansas Commission on Peace Officers' Standards and Training (KSCPOST) alleging dishonesty, retaliation, and failure to investigate.

d. In March 2025, Cody Clark says Bryan became aggressive and threatening when asked not to park on his property, and that the mayor ignored his complaint.

e. On July 6, 2025, Michelle Nagy, a nurse practitioner fleeing domestic violence, called Bentley police for help reaching a shelter. She says Bryan drove her and her eight-year-old daughter to a hotel at 520 E. 53rd Street North in Park City, outside Bentley, then demanded her ID despite promising anonymity. When she walked away with her daughter, she says he followed her without warning, sprayed her with mace, took her to the ground, and sat on her chest. He handcuffed her tightly enough that her wrists bled. She was not under arrest before this. Bryan charged her with battery on a law enforcement officer, interference, and child endangerment. She says she has not been convicted, the case is set for trial, and she was told no body-camera footage exists.

49. After Joseph's friend Donald Read asked Bentley for records about Joseph's case, Bryan's department named Mr. Read a suspect in a "false impersonation" case, no. 25-0031. When Mr. Read asked the City for the name and position of the complainant in that case, the City answered on April 1, 2026: "None." Despite repeated requests, Mr. Read has never been told what became of the case.

50. On information and belief, at least eleven complaints about Bryan have been submitted to a public Brady/Giglio website. On May 2, 2026, Ashley Blackmon asked the City for records of complaints, investigations, discipline, and use of force involving Bryan. The City promised a response by May 8, then went silent until September 21, after repeated follow-ups. On September 24, 2026, the City stated in writing that it has no internal affairs investigations and no disciplinary records for Bryan. On information and belief, the City has never investigated any complaint against him.

51. The City has known of these concerns and done nothing. For two years, Joseph's family and others reported Bryan's conduct on November 1, 2024 to Mayor Tracy Pribbenow and every member of the City Council. None responded. Instead, Mayor Pribbenow, "in agreement with the City Council," issued a public statement giving Bryan the City's "complete endorsement and support" and declaring that no wrongdoing had been found "in any of the alleged situations." At an April 2026 council meeting, Mayor Pribbenow called a resident who complained about Bryan a liar.

52. On April 1, 2026, responding to Mr. Read's records request, then-City Clerk Lisa Frederick wrote that the City has no employment application for Bryan ("None on file") and no complaints against him ("None on file with City"), even though residents had complained about Bryan to the Mayor and to state agencies, as described above. On information and belief, the City hired him as both Chief of Police and City Administrator without a meaningful background check, although his history was easy to find in public court records and newspapers.

## CLAIMS FOR RELIEF

### COUNT I — Unreasonable Seizure and False Arrest (Fourth Amendment)

*Against Bryan in his individual capacity*

53. Joseph incorporates all preceding paragraphs.

54. Bryan seized and arrested Joseph at his own home without a warrant, without probable cause, and without exigent circumstances. Bryan was off duty, outside his jurisdiction, in an unmarked personal vehicle, and had abandoned any pursuit before Joseph got home. When Bryan arrested him, Joseph was unarmed, standing in his own yard, and repeatedly asking why he was being arrested.

55. This violated Joseph's clearly established Fourth Amendment right to be free from unreasonable seizure.

**COUNT II — Excessive Force (Fourth Amendment)**
*Against Bryan in his individual capacity*

56. Joseph incorporates all preceding paragraphs.

57. Bryan kicked Joseph's leg out from under him and forced him to the ground while Joseph was unarmed, at his own home, suspected at most of traffic offenses, and posing no threat. The force was objectively unreasonable and injured Joseph's leg and knee.

58. This violated Joseph's clearly established Fourth Amendment right to be free from excessive force.

**COUNT III — Unreasonable Search of Home and Vehicle (Fourth Amendment)**
*Against Bryan in his individual capacity*

59. Joseph incorporates all preceding paragraphs.

60. Bryan entered and searched Joseph's home alone, without a warrant, exigent circumstances, or voluntary consent, and took property from it. He also searched Joseph's Jeep repeatedly without a warrant or probable cause and found nothing.

61. These searches violated Joseph's clearly established Fourth Amendment rights.

**COUNT IV — Fabrication of Evidence (Fourteenth Amendment Due Process)**
*Against Bryan in his individual capacity*

62. Joseph incorporates all preceding paragraphs.

63. Bryan knowingly made false statements in his report and on the DC-27 refusal form, including claims of slurred speech, difficulty communicating, and poor balance that

video contradicts, and his certification that Joseph refused testing when Joseph was in no condition to knowingly refuse.

64. Those false statements caused the suspension of Joseph's driver's license and the ongoing interlock requirement, depriving him of property and liberty without due process of law. In the alternative, Bryan's conduct in certifying a refusal by a man who was confused and heavily medicated after repeated seizures, after hospital staff had already tested his blood and found no alcohol, was arbitrary and shocks the conscience.

**COUNT V — Substantive Due Process: The Pursuit (Fourteenth Amendment)**

*Against Bryan in his individual capacity*

65. Joseph incorporates all preceding paragraphs.

66. Bryan never stopped or seized Joseph during the pursuit, so his conduct during the pursuit is governed by the Due Process Clause of the Fourteenth Amendment.

67. Off duty, in an unmarked personal vehicle, outside his jurisdiction, and over at most a perceived traffic offense, Bryan chased a family vehicle carrying Joseph, his wife, his mother, and his seven-year-old daughter at high speed for about seven miles through Wichita at night. He radioed that he was an officer in distress, summoning a Kansas Highway Patrol helicopter and officers from several agencies.

68. On information and belief, Bryan's pursuit served no legitimate law enforcement purpose and was intended to intimidate and punish Joseph. It terrified Joseph and his family, who believed a stranger was chasing them, and it shocks the conscience.

**COUNT VI — Municipal Liability (Monell)**

*Against the City of Bentley and Bryan in his official capacity*

69. Joseph incorporates all preceding paragraphs.

70. <u>Final policymaker.</u> Bryan was both Chief of Police and City Administrator, with final, unreviewed authority over the City's law enforcement. His decisions on November 1, 2024 to pursue, arrest, use force, and search outside the City's jurisdiction, with no recording, were the City's own policy.

71. Ratification. After learning of Bryan's conduct, Mayor Pribbenow and the City Council publicly endorsed it, found no wrongdoing, and ignored two years of complaints.

72. Inadequate screening at hiring. The City hired Bryan without a meaningful background check, despite a public record of prior force, discrimination, and misconduct allegations. The risk that he would use excessive force and conduct unlawful arrests and searches was plainly obvious, and the City's decision to hire him anyway reflected deliberate indifference to that risk.

73. Failure to supervise. The City placed no check on Bryan, who supervised himself, and required no body or dash cameras, despite repeated complaints. This showed deliberate indifference to residents' constitutional rights.

74. Through these policies and decisions, the City acted with deliberate indifference to the constitutional rights of the people Bryan policed, including Joseph. They were the moving force behind the violations in Counts I through V.

## PRAYER FOR RELIEF, JURY DEMAND AND SIGNATURES

Joseph asks the Court to enter judgment in his favor and award:

1. Compensatory damages against both Defendants in an amount to be proven at trial, including lost wages, interlock costs, and medical expenses;

2. Punitive damages against Bryan in his individual capacity;

3. Costs, and reasonable attorney's fees under 42 U.S.C. § 1988 if Joseph retains counsel; and

4. Any other relief the Court finds just.

**Jury demand.** Joseph demands a trial by jury on all issues so triable.

Dated: November 2, 2026

Respectfully submitted,

Joseph L. Sublett, Plaintiff, pro se
7434 W. Warren Street
Wichita, Kansas 67212
(316) 871-1716
joeysublett@icloud.com